FILED
2021 MAR 29 AM 10:30
CLERK
U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
### CENTRAL DIVISION

| | |
|---|---|
| REBEKAH GATTI,<br><br>            Plaintiff,<br><br>v.<br><br>GRANGER MEDICAL CLINIC, P.C.,<br><br>            Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 57) AND GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 60)**<br><br>Case No. 2:19-cv-00028-DAO<br><br>Magistrate Judge Daphne A. Oberg |

Plaintiff Rebekah Gatti brought this action against her former employer, Defendant Granger Medical Clinic, P.C. ("Granger"), asserting a claim for retaliation under the False Claims Act, 31 U.S.C. §§ 3729–3733. (Compl. ¶¶ 17–24, Doc. No. 1.) Ms. Gatti alleges she was unlawfully terminated in retaliation for reporting fraudulent billing practices and threatening to file a *qui tam* action against Granger. (*Id.* ¶ 19.) Granger filed counterclaims against Ms. Gatti for breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, violation of Utah's Uniform Trade Secrets Act, Utah Code Ann. § 13-24-1, *et seq.*, and injunctive relief. (Am. Answer and Countercl. ¶¶ 26–64, Doc. No. 49.)

Before the court are Ms. Gatti's motion for summary judgment on Granger's counterclaims ("Gatti MSJ," Doc. No. 57) and Granger's motion for summary judgment on Ms. Gatti's retaliation claim ("Granger MSJ," Doc. No. 60). The court held a hearing on these motions on September 28, 2020. (Doc. No. 90.)

Having considered the parties' briefing and arguments at the hearing, the court[1] GRANTS Granger's motion for summary judgment (Doc. No. 60) and enters summary judgment in favor of Granger on Ms. Gatti's claim of retaliation under the False Claims Act.  The court GRANTS IN PART AND DENIES IN PART Ms. Gatti's motion for summary judgment on Granger's counterclaims (Doc. No. 57).  The court GRANTS the motion and enters summary judgment in favor of Ms. Gatti on Granger's counterclaims of breach of contract, breach of the implied covenant of good faith and fair dealing, and breach of fiduciary duty, and on its counterclaim for damages under Utah's Uniform Trade Secrets Act.  The court DENIES the motion with respect to Granger's claim for injunctive relief under Utah's Uniform Trade Secrets Act.

SUMMARY JUDGMENT STANDARD

Courts grant summary judgment only where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit.  A dispute over a material fact is 'genuine' if a rational jury could find in favor of the nonmoving party on the evidence presented."  *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1215 (10th Cir. 2013) (internal quotation marks omitted).  In evaluating a motion for summary judgment, the court views "the facts in the light most favorable to the nonmovant and draw[s] all reasonable inferences in the nonmovant's favor."  *Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015).  But, "where the non moving party will bear the burden of proof at trial on a dispositive issue that party must go beyond the pleadings and designate specific facts so as to make a

---

[1] The parties consent to proceed before a magistrate judge in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  (Doc. No. 27.)

showing sufficient to establish the existence of an element essential to that party's case in order to survive summary judgment." *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998) (internal quotation marks omitted).

DISCUSSION

## I.    GRANGER'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 60)

Granger moves for summary judgment on Ms. Gatti's claim of retaliation under the False Claims Act, arguing Ms. Gatti cannot present evidence sufficient to create a triable issue of fact as to this claim.  (Granger MSJ 2–3, Doc. No. 60.)

### A.  Relevant Facts

Ms. Gatti began full time employment with Granger as a coding auditor on December 3, 2014.  (Granger MSJ, Undisputed Material Facts ("Facts") ¶ 1, Doc. No. 60; Ex. A to Granger MSJ, Dep. of Rebekah Gatti ("Gatti Dep.") 46:1–4, 46:14–16, Doc. No. 64-1.)  As a coding auditor, Ms. Gatti was responsible for review, analysis, and improvement of medical billing codes entered by Granger medical providers.  (Granger MSJ, Facts ¶ 2, Doc. No. 60; Gatti Dep. 46: 21–47:25, Doc. No. 64-1.)

In February 2015, Ms. Gatti was promoted to coding manager.  (Gatti Dep. 58:15–20, Doc. No. 64-1.)  As coding manager, in addition to her prior duties, she was also responsible for supervising the coding team, identifying and correcting coding errors, educating the coding team and medical providers, and ensuring Granger submitted the right codes to insurance companies, Medicare, and Medicaid.  (Gatti Dep. 58:24–59:10, 62:9–20, 65:11–17, Doc. No. 64-1; Ex. B to Granger MSJ, Dep. of David Tanner ("Tanner Dep.") 225:2–16, Doc. No. 64-2.)

<u>Ms. Gatti's Report Regarding Dr. Vogeler's Billing</u>

In late 2016, Granger purchased the family medicine practice of Dr. Douglas Vogeler. (Pl.'s Resp. and Mem. in Opp'n to Def.'s Mot. for Summ. J. (Sealed) ("Opp'n to Granger MSJ"), Statement of Additional Material Facts ("Add'l Facts") ¶ 1, Doc. No. 75; App. to Opp'n to Granger MSJ, Decl. of Rebekah Gatti ("Gatti Decl.") ¶ 5, Doc. No. 75-1 at 5.)  Ms. Gatti quickly came to believe Dr. Vogeler and his staff were committing Medicare fraud by overcoding patient encounters and performing unnecessary procedures.  (Opp'n to Granger MSJ, Add'l Facts ¶ 1, Doc. No. 75; Gatti Decl. ¶ 5, Doc. No. 75-1 at 5.)  Ms. Gatti attempted, on many occasions, to raise her concerns directly with Dr. Vogeler and his medical assistant, Whitney Miller.  (Opp'n to Granger MSJ, Add'l Facts ¶ 2, Doc. No. 75; Gatti Decl. ¶ 6, Doc. No. 75-1 at 5–6.)  Her attempts included various training and counseling sessions between October 2016 and March 2017.  (Opp'n to Granger MSJ, Add'l Facts ¶ 2, Doc. No. 75; Gatti Decl. ¶ 6, Doc. No. 75-1 at 5–6.)

According to Ms. Gatti, these training and counseling sessions did not stop Dr. Vogeler's overbilling.  (Gatti Decl. ¶ 7, Doc. No. 75-1 at 6.)  On May 17, 2017, Ms. Gatti raised the issue in an email to her supervisor, Granger Chief Financial Officer Jeff Davis, reporting the following "[c]ompliance concerns regarding Dr. Vogeler's billing":

1. Billing levels of service higher than what the documentation supports (using CMS coding guidelines).  If the provider is using time as a factor (counseling and coordination of care criteria), he is not noting time in the record.
2. Billing an additional level of service with a preventive visit to Select Health when the documentation doesn't support their criteria for a separately identifiable E/M.
3. Billing preventive services when the documentation doesn't support that preventive services were rendered, in particular the necessary elements for Annual Wellness Visits.  (Medicare)
4. Billing for the IPPE (Welcome to Medicare) without documentation of the necessary elements for this service.

     5.  Billing Medicare for routine EKG's without the note indicating medical necessity.

     6.  Billing Medicare for non-covered services (e.g. Tdap)

     7.  Billing for procedures without corresponding procedure note.

(*Id.*; App. to Opp'n to Granger MSJ, Email from Rebekah Gatti to Jeff Davis (May 17, 2017), Doc. No. 75-1 at 38.)

<u>Granger's Response to Ms. Gatti's Report</u>

Meanwhile, in the spring of 2017, Dr. Vogeler began attempting to have Ms. Gatti removed from reviewing his coding and billing.  (Opp'n to Granger MSJ, Add'l Facts ¶ 3, Doc. No. 75.)  On April 18, Dr. Vogeler emailed Granger's then-Chief Executive Officer David Tanner to complain that Ms. Gatti "continues to write off a lot of things at first rejection instead of resubmitting."  (Opp'n to Granger MSJ, Add'l Facts ¶ 3, Doc. No. 75; App. to Opp'n to Granger MSJ, Email from Douglas Vogeler to David Tanner (Apr. 18, 2017), Doc. No. 75-1 at 35.)  On May 2, he again emailed Mr. Tanner to complain:

> Billing is getting worse and so many mistakes are being made, written off, downcoded or passed on to pat[i]ents despite us resubmitting corrections to Rebekah . . . .  She is costing me thousands and is holding up billings.  I will no longer put up with Rebekah's obstructions, so give me someone else who is on the side of the doctor and not the insurance company.

(Opp'n to Granger MSJ, Add'l Facts ¶ 3, Doc. No. 75; App. to Opp'n to Granger MSJ, Email from Douglas Vogeler to David Tanner (May 2, 2017), Doc. No. 75-1 at 37.)

On June 19, 2017, Ms. Gatti received an e-mail from her supervisor, Jeff Davis, stating: "Still working on a plan for this . . . but for now—stop working on Vogeler or Moore claims." (App. to Opp'n to Granger MSJ, Email from Jeff Davis to Rebekah Gatti (June 19, 2017), Doc. No. 75-1 at 40.)  According to Ms. Gatti, after she received this email, she had no further interaction with Dr. Vogeler or his staff, which prevented her from performing her job duties

with respect to Dr. Vogeler.[2]  (Opp'n to Granger MSJ, Add'l Facts ¶ 6, Doc. No. 75; Gatti Decl. ¶ 8, Doc. No. 75-1 at 6.)  She performed no further training or counseling sessions with Dr. Vogeler or his staff.  (Gatti Decl. ¶ 8, Doc. No. 75-1 at 6.)  Other members of the coding team were assigned to review prospective claims coded by Dr. Vogeler (claims not yet paid), and although Ms. Gatti assisted them with questions, she was not allowed to make any corrections to those claims.[3]  (*Id.* ¶ 9, Doc. No. 75-1 at 6–7.)  Instead, she only reviewed Dr. Vogeler's codings specifically assigned to her by Jeff Davis, which consisted of an audit of retrospective claims (claims which had already been paid).  (*Id.*)

In the summer of 2017, Granger responded to the issues Ms. Gatti raised by launching an investigation into Dr. Vogeler's coding and billing practices.  (Tanner Dep. 18:23–19:3, 21:5–11, 71:8–25, Doc. No. 64-2.)  This included performing an internal review of Dr. Vogeler's coding practices; holding executive meetings and discussions regarding his practices; meeting with Dr. Vogeler and his staff; and retaining outside auditors to review Dr. Vogeler's coding practices. (Ex. C to Granger MSJ, Decl. of Mary Jane Pennington ("Pennington Decl.") ¶ 11, Doc. No. 60-4; Tanner Dep. 21:5–11, 54:5–10, 55:16–24, 73:19–21, 83:1–20, Doc. No. 64-2; Ex. D to Granger MSJ, Dep. of Jeff Davis ("Davis Dep.") 46:4–47:16, Doc. No. 64-3.)  Ms. Gatti does not dispute these actions were taken, but asserts she was excluded from the meetings regarding Dr.

---

[2] As Granger notes, Ms. Gatti had subsequent email communication with Dr. Vogeler's medical assistant, Ms. Miller, on at least one occasion in August 2017, as described below.  (*See* App. to Opp'n to Granger MSJ, Email chain dated August 2 to August 15, 2017, Doc. No. 75-1 at 65–69.)

[3] Granger asserts Ms. Gatti herself appointed subordinates to review Dr. Vogeler's claims, supervised their work, and had authority to review and edit these claims.  (Granger MSJ, Facts ¶¶ 13–15, Doc. No. 60.)  For purposes of Granger's motion, the court resolves this factual dispute in favor of Ms. Gatti as the nonmoving party.

Vogeler's billing practices and was unaware they were being held.  (Gatti Decl. ¶ 10, Doc. No. 75-1 at 7.)  According to Granger, it ultimately required Dr. Vogeler and his staff to conform with Ms. Gatti's recommendations and to meet with Ms. Gatti's department in order to review and improve his coding and billing practices moving forward.  (Pennington Decl. ¶ 11, Doc. No. 60-4.)  Ms. Gatti, on the other hand, asserts Granger failed to re-submit Dr. Vogeler's overbilled claims with corrected codes or to repay Medicare, Medicaid, or private insurers for those claims, as she had recommended.  (Gatti Decl. ¶ 12, Doc. No. 75-1 at 8.)

<u>Ms. Gatti's Emails to Granger's Human Resources Director and COO</u>

On July 17, 2017, Ms. Gatti forwarded her May 17 email listing her concerns regarding Dr. Vogeler's billing practices to Katie Jolles, the human resources director.  (App. to Opp'n to Granger MSJ, Email from Rebekah Gatti to Katie Jolles (July 17, 2017), Doc. No. 75-1 at 38.)

In August 2017, Ms. Gatti exchanged emails with Dr. Vogeler's medical assistant Whitney Miller and others regarding a billing issue, during which Ms. Miller expressed that Ms. Gatti was not supposed to be reviewing Dr. Vogeler's billing.  (App. to Opp'n to Granger MSJ, Email from Whitney Miller to Merilyn Harris, copying Rebekah Gatti (Aug. 14, 2017), Doc. No. 75-1 at 67; *see also* App. to Opp'n to Granger MSJ, Email chain dated August 2 to August 15, 2017, Doc. No. 75-1 at 65–69.)  On August 16, 2017, Ms. Gatti forwarded the email chain to her supervisor, Mr. Davis, and the human resources director, Ms. Jolles, expressing frustration that a medical assistant "is telling me which functions of my job (coding MANAGER) I am allowed to perform."  (App. to Opp'n to Granger MSJ, Email from Rebeka Gatti to Jeff Davis and Katie Jolles (Aug. 16, 2017), Doc. No. 75-1 at 65.)  She stated: "I am tired of the bullying, and not being allowed to perform the duties for ALL of the Granger providers.  I don't plan on going

anywhere because I love this job, but I want to file a complaint.  Please let me know how to go about this." (*Id.*; *see also* Gatti Decl. ¶ 11, Doc. No. 75-1 at 7–8.)

On January 5, 2018, having received no response from Ms. Jolles to her August 16 email requesting to file a formal complaint, Ms. Gatti forwarded that email and the prior email chain to Granger's Chief Operating Officer, Claire Chitwood.  (App. to Opp'n to Granger MSJ, Email from Rebekah Gatti to Claire Chitwood (Jan. 5, 2018), Doc. No. 75-1 at 65.)  Ms. Gatti stated, "Here is [the] email where I asked the process for filing a complaint.  I never received a response." (*Id.*)

On February 2, 2018, Ms. Gatti's supervisor, Jeff Davis, resigned from Granger.  (Opp'n to Granger MSJ, Add'l Facts ¶ 16, Doc. No. 75.)  During his deposition, Mr. Davis testified that Ms. Gatti had mentioned "multiple" times, "starting probably in July" that she could file a *qui tam* lawsuit against Granger related to Dr. Vogeler.  (App. to Opp'n to Granger MSJ, Davis Dep. 58:7–59:21, Doc. No. 75-1 at 174.)  Mr. Davis said that on his last day at Granger, during his exit interview, he told Chief Executive Officer David Tanner that he believed Ms. Gatti might file "some sort of a lawsuit." (*Id.* at 60:17–61:1, 62:6–10, Doc. No. 75-1 at 174–75.)  He told Mr. Tanner, "I feel that there's risk here with her because . . . she's stubborn enough that she kind of feels like she might just give someone the finger and do something to prove a point or inflict harm rather than trying to help us fix something. . . . There's just risk there and so we need to be gentle with her." (*Id.* at 61:13–20, Doc. No. 75-1 at 174.)  David Tanner testified that Mr. Davis told him during the exit interview that Ms. Gatti had "threatened a *qui tam* claim," and he said this was the first time he had heard of the possibility of Ms. Gatti filing a *qui tam* complaint against Granger.  (App. to Opp'n to Granger MSJ, Tanner Dep. 136:10–11, 137:3–8, Doc. No. 75-1 at 134.)

<u>Restructuring and Termination</u>

In March of 2018, Granger decided to change its reporting structure to have the coding department begin reporting to the revenue cycle department.  (Granger MSJ, Facts ¶ 21, Doc. No. 60; Pennington Decl. ¶ 14, Doc. No. 60-4.)  On March 23, 2018, CEO David Tanner met with Ms. Gatti and told her she would begin reporting to Tangie Williams, the head of the revenue cycle department.  (Gatti Decl. ¶ 13, Doc. No. 75-1 at 8.)  Ms. Gatti told Mr. Tanner she did not want to report to Ms. Williams, and he told Ms. Gatti that he would accept her resignation.  (*Id.*)  Ms. Gatti said she had no intention of resigning.  (*Id.*)  Mr. Tanner then emailed Ms. Gatti explaining that Granger was restructuring, and the coding department would "report to revenue cycle rather than continu[ing] to operate in an independent man[ner]."  (Ex. G to Granger MSJ, Email from David Tanner to Rebekah Gatti and Tangie Williams (Mar. 23, 2018), Doc. No. 60-8 at 2.)  Ms. Gatti responded that she was "unwilling to comply."  (Ex. G to Granger MSJ, Email from Rebekah Gatti to David Tanner (Mar. 23, 2018), Doc. No. 60-8 at 2.)  The next day, on March 24, she sent a follow-up email stating "[t]he timing of this . . . is not lost on the *qui tam* attorney," and that she would "continue working in the same capacity as I did last week until you opt to terminate me."[4]  (Ex. G to Granger MSJ, Email from Rebekah Gatti to David Tanner (Mar. 24, 2018), Doc. No. 60-8 at 10.)

On March 25, Mr. Tanner sent Ms. Gatti a long email, describing his surprise at her mention of a *qui tam* attorney, reminding Ms. Gatti that she has been responsible for oversight of all of Granger's medical coding, explaining the actions taken in response to her concerns about

---

[4] It is undisputed Ms. Gatti had not actually contacted or hired a *qui tam* attorney at the time she made this statement.  (Granger MSJ, Facts ¶ 28, Doc. No. 60; Opp'n to Granger MSJ, Resp. to Statement of Undisputed Material Facts ¶ 28, Doc. No. 75.)

Dr. Vogeler's coding, and asking her if there was anything Granger had "not done to follow [her] recommendations regarding Dr. Vogeler." (Ex. G to Granger MSJ, Email from David Tanner to Rebekah Gatti (Mar. 25, 2018), Doc. No. 60-8 at 9–10.) After another email from Mr. Tanner asking for a response, Ms. Gatti responded, "I don't have any further information to provide. There is nothing that I have not previously disclosed." (Ex. G to Granger MSJ, Email from Rebekah Gatti to David Tanner (Mar. 27, 2018, 11:28 a.m.), Doc. No. 60-8 at 8.) In a follow-up email, Mr. Tanner again asked whether there was "anything with Granger's coding activity that does not follow rules and guidelines or has not been corrected as of today." (Ex. G to Granger MSJ, Email from David Tanner to Rebekah Gatti (Mar. 27, 2018, 11:45 a.m.), Doc. No. 60-8 at 8.) Ms. Gatti responded: "I made observations, suggestions as to how compliance could be achieved and in what time frame, but as to what has been accomplished, I don't know." (Ex. G to Granger MSJ, Email from Rebekah Gatti to David Tanner (Mar. 27, 2018, 11:59 a.m.), Doc. No. 60-8 at 8.)

On March 28, Mr. Tanner told Ms. Gatti she would continue to report to him. (Gatti Decl. ¶ 13, Doc. No. 75-1 at 8.) Ms. Gatti did so until April 17, 2018, when she was told she was being terminated. (*Id.*) The termination letter she received on April 18 stated, "Due to a reorganization your position has been eliminated, effective immediately." (Ex. I to Granger MSJ, Letter from David Tanner to Rebekah Gatti (Apr. 18, 2018) ("Termination Letter"), Doc. No. 60-10.)

According to Granger, it decided to restructure to address a systemic problem of dysfunction between coders and claims representatives which resulted in some claims not being processed, and the change was recommended by a third-party auditor. (Granger MSJ, Facts ¶¶ 21, 23, Doc. No. 60; Tanner Dep. 142:14–145:10, Doc. No. 64-2; Pennington Decl., ¶ 14,

Doc. No. 60-4.)  However, Ms. Gatti disputes that elimination of her position was part of the planned restructuring.  (Opp'n to Granger MSJ, Resp. to Statement of Undisputed Material Facts ¶ 21, Doc. No. 75.)  The third-party auditor's report does not include a recommendation to eliminate the coding manager position.  (*See* App. to Opp'n to Granger MSJ, Curas Report, Doc. No. 75-1 at 70–114.)  And Mr. Tanner testified that he decided to "eliminate the position" only "a day or two" before Ms. Gatti's termination letter.  (Tanner Dep. 174:20–175:3, Doc. No. 75-1 at 140.)

Mr. Tanner testified that Ms. Gatti was fired due to a reorganization, but that insubordination was "a contributing factor."  (Tanner. Dep. 125:5–126:2, Doc. No. 75-1 at 131–32.)  He explained that without her insubordination, she would have remained at Granger "with the same title and the same salary, but a different reporting relationship."  (Tanner Dep. 126:3–6, Doc. No. 75-1 at 132.)  However, he acknowledged that insubordination was not the reason for termination listed on her termination letter.  (Tanner Dep. 127:18-20, Doc. No. 75-1 at 132.)

### B.  Applicable Law

The False Claims Act (FCA) imposes liability on any person who "knowingly presents . . . a false or fraudulent claim for payment or approval" to the United States government, 31 U.S.C. § 3729(a)(1)(A), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," *id.* § 3729(a)(1)(B). The FCA authorizes individuals to bring *qui tam* suits on behalf of the government and to keep a percentage of any monies recovered.  *See id.* § 3730(b)–(d).

"[B]ecause insiders might be reluctant to use these *qui tam* provisions due to fear of employer backlash, the False Claims Act protects whistleblowers from employer retaliation." *United States ex rel. Reed v. Keypoint Gov't Sols.*, 923 F.3d 729, 738 (10th Cir. 2019).  "To

qualify for whistleblower protection, an employee must engage in 'protected activity.'" *Id.* The FCA's anti-relation provision imposes liability on an employer if an employee is "discriminated against in the terms and conditions of employment because of lawful acts done by the employee . . . in furtherance of an action under this section or other efforts to stop 1 or more violations of [the FCA]." 31 U.S.C. § 3730(h)(1); *see also Armstrong v. Arcanum Grp., Inc.*, 897 F.3d 1283, 1286 (10th Cir. 2018). "Such lawful acts are commonly referred to as 'protected activity.'" *Armstrong*, 897 F.3d at 1286.

Courts have applied the familiar burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973), to retaliation claims under the FCA. *See, e.g.*, *United States ex rel. King v. Solvay Pharms., Inc.*, 871 F.3d 318, 332 (5th Cir. 2017); *Harrington v. Aggregate Indus.-Ne. Region Inc.*, 668 F.3d 25, 31 (1st Cir. 2012); *Armstrong v. Arcanum Grp. Inc.*, No. 16-CV-1015-MSK-CBS, 2017 U.S. Dist. LEXIS 156346, at *7–8 (D. Colo. Sept. 25, 2017) (unpublished), *aff'd*, *Armstrong*, 897 F.3d 1283. Under this framework, a plaintiff must establish a prima facie case of retaliation by presenting evidence that "(1) the plaintiff was engaged in conduct protected by the FCA; (2) the plaintiff's employer knew about such protected activity and took an adverse action against the employee; and (3) the plaintiff's protected activity was the but-for cause of the adverse action." *Armstrong*, 2017 U.S. Dist. LEXIS 156346, at *7. If the plaintiff succeeds in establishing a prima facie case, the defendant must then articulate a legitimate, nonretaliatory reason for taking adverse action against the plaintiff. *See id.* at *8. The plaintiff must then produce evidence sufficient for a reasonable factfinder to find the explanation to be pretext for retaliation. *See id.*

### C. Analysis

Granger argues Ms. Gatti cannot establish a prima facie case because she does not have sufficient evidence to show she engaged in protected activity, that Granger knew of such protected activity, or that she was terminated because of such activity.  (Granger MSJ 11, Doc. No. 60.)  Granger also asserts Ms. Gatti was terminated due to restructuring, and argues Ms. Gatti cannot show evidence of pretext.  (*Id.* at 23–27.)

#### 1.  Protected Activity and Notice

Granger argues Ms. Gatti was not engaged in protected activity when she reported issues with Dr. Vogeler's coding practices, and Granger was not on notice of such activity, because this reporting was part of her job as coding manager.  (Granger MSJ 14–15, Doc. No. 60.)  Granger also contends Ms. Gatti's mention of a *qui tam* attorney to the CEO in March of 2018 was not protected activity, but merely a threat to avoid her employer's legitimate instruction to report to a different supervisor.  (*Id.* at 15–16; Def.'s Reply Mem. in Support of Its Mot. for Summ. J. as to Pl.'s Compl. ("Reply to Granger MSJ") 2, Doc. No. 84.)  Ms. Gatti argues she engaged in protected activity sufficient to put Granger on notice because (1) she was not a compliance officer and her reports went beyond typical compliance duties, (2) she was prevented from performing her duties with respect to Dr. Vogeler, (3) she went outside the chain of command to report her concerns, and (4) she expressly threatened to file a *qui tam* lawsuit.  (Opp'n to Granger MSJ 17–23, Doc. No. 75.)

"[C]ompliance employees typically must do more than other employees to show that their employer knew of the protected activity."  *Reed*, 923 F.3d at 767.  This is because "an employer might reasonably presume that when a compliance employee reports incidents of fraud she is just doing her job."  *Id.*  Likewise, the FCA "generally does not protect activities that are within the

scope of an employee's job responsibilities." *Adler v. Continental Ins. Co.*, No. 95-2282-EEO, 1996 U.S. Dist. LEXIS 17500, at *11 (D. Kan. Nov. 1, 1996) (unpublished).

In *Reed*, the Tenth Circuit addressed a compliance employee's argument that her employer was on notice of protected activity because she went outside her normal chain of command to report fraudulent conduct.  923 F.3d at 769 (considering whether a complaint stated a claim for retaliation under the FCA).  The court noted it had "never expressly held that a compliance employee may put her employer on notice of her efforts to stop False Claims Act violations by reporting fraud internally but outside her chain of command," but recognized other circuits had so held.  *Id*. (citing *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890, 908 (9th Cir. 2017); *United States ex rel. Schweizer v. Oce N.V.*, 677 F.3d 1228, 1239–40 (D.C. Cir. 2012)).  The *Reed* court declined to decide whether to adopt such a rule because it concluded the employee failed to sufficiently allege she made reports outside her chain of command.  *Id.* at 770–71.  Although she alleged she reported the fraud to "everyone . . . who would listen," *id.* at 767, she "never pleaded facts delineating her specific job description or defining the scope of her duties such that [the court] could discern with some specificity the contours of [her] chain of command or ordinary reporting structure related to fraud matters," *id.* at 770.  The *Reed* court contrasted this scenario with the facts of *Schweizer*, where the plaintiff repeatedly disobeyed her supervisor's orders to stop investigating the alleged fraud, went over her supervisor's head by reporting allegations of specific FCA violations to her supervisor's boss, and was subsequently fired for ignoring the chain of command.  *Id.* at 771*; see also Schweizer*, 677 F.3d at 1239–40.

Notice may also be provided "by expressly stating an intention to bring a *qui tam* suit," or "by any action which a factfinder reasonably could conclude would put the employer on notice that litigation is a reasonable possibility." *Eberhardt v. Integrated Design & Constr., Inc.*, 167

F.3d 861, 868 (4th Cir. 1999). "These types of actions are sufficient because they let the employer know, regardless of whether the employee's job duties include investigating potential fraud, that litigation is a reasonable possibility." *Id.*; *see also McBride v. Peak Wellness Ctr., Inc.*, 688 F.3d 698, 704 (10th Cir. 2012) ("Whistleblowers must make clear their intentions of bringing or assisting in an FCA action in order to overcome the presumption that they are merely acting in accordance with their employment obligations." (internal quotation marks omitted)).

However, whistleblower provisions are not "intended to be used by employees to shield themselves from the consequences of their own misconduct or failures." *Trimmer v. United States Dep't of Labor*, 174 F.3d 1098, 1104 (10th Cir. 1999). Moreover, mere insubordination is not a protected activity. *See Kahn v. United States Sec'y of Labor*, 64 F.3d 271, 279 (7th Cir. 1995) (rejecting the plaintiff's "attempt to hide behind his protected activity as a means to evade termination for non-discriminatory reasons," including insubordination); *Florida Steel Corp. v. Nat'l Labor Relations Bd.*, 529 F.2d 1225, 1234 (5th Cir. 1976) (noting that statutory protections against discriminatory discharge were "not a sword with which one may threaten or curse supervisors," and insubordination was not a protected activity).

As an initial matter, Ms. Gatti argues she was not a "compliance officer" because a different employee, Mary Jane Pennington, held that title, and because Ms. Gatti was not specifically tasked with investigating or reporting instances of alleged fraud. (Opp'n to Granger MSJ 26, Doc. No. 75.) Nevertheless, it is undisputed that Ms. Gatti's duties as coding manager included identifying and correcting coding errors, educating the coding team and medical providers, and ensuring Granger submitted the right codes to insurance companies, Medicare, and Medicaid. (Gatti Dep. 58:24–59:10, 62:9–20, 65:11–17, Doc. No. 64-1; Tanner Dep. 225:2–

16, Doc. No. 64-2.)  Thus, the question is whether Ms. Gatti took actions beyond her normal job duties sufficient to put Granger on notice of protected activity under the FCA.

Ms. Gatti presented evidence that:

- she reported a list of specific "compliance concerns" regarding Dr. Vogeler's coding and billing practices to her supervisor, Jeff Davis, on May 17, 2017, (App. to Opp'n to Granger MSJ, Email from Rebekah Gatti to Jeff Davis (May 17, 2017), Doc. No. 75-1 at 38);

- Ms. Davis instructed her to stop working on Dr. Vogeler's claims on June 19, 2017, (App. to Opp'n to Granger MSJ, Email from Jeff Davis to Rebekah Gatti (June 19, 2017), Doc. No. 75-1 at 40);

- after June 19, 2017, she was not allowed to make corrections to Dr. Vogeler's claims and performed no further training with Dr. Vogeler or his staff, (Gatti Decl. ¶¶ 8–9, Doc. No. 75-1 at 6–7);

- she forwarded her May 17 email regarding compliance concerns to the human resources director on July 17, 2017, (App. to Opp'n to Granger MSJ, Email from Rebekah Gatti to Katie Jolles (July 17, 2017), Doc. No. 75-1 at 38);

- she emailed the human resources director again on August 16, 2017, stating she was not being allowed to do her job with respect to Dr. Vogeler and requesting to file a complaint, (App. to Opp'n to Granger MSJ, Email from Rebeka Gatti to Jeff Davis and Katie Jolles (Aug. 16, 2017), Doc. No. 75-1 at 65);

- she forwarded this August 16 email to Granger's Chief Operating Officer on January 5, 2018, and indicated she had never received a response, (App. to Opp'n

to Granger MSJ, Email from Rebekah Gatti to Claire Chitwood (Jan. 5, 2018),
Doc. No. 75-1 at 65);

- she made numerous comments about filing a *qui tam* lawsuit related to Dr.
  Vogeler to her supervisor, Mr. Davis, beginning around July of 2017, which Mr.
  Davis communicated to Granger's CEO David Tanner on February 2, 2018,
  (Davis Dep. 58:7–59:21, 60:17–61:1, 62:6–10, Doc. No. 75-1 at 174–75; Tanner
  Dep. 136:10–11, 137:3–8, Doc. No. 75-1 at 134); and

- she mentioned a *qui tam* attorney in an email to David Tanner on March 24, 2018,
  after he informed her of Granger's plans to restructure (Ex. G to Granger MSJ,
  Email from Rebekah Gatti to David Tanner, (Mar. 24, 2018), Doc. No. 60-8 at
  10).

Based on this evidence, a reasonable factfinder could conclude Ms. Gatti's actions before
February 2, 2018 went beyond her normal job duties and were sufficient to put Granger on notice
of protected activity.  First, her initial report to her supervisor put Granger on notice of specific
issues regarding the legality of Dr. Vogeler's billing practices.  Although this initial report could
be considered within her job duties to identify and correct coding errors, she has presented
evidence that she was prevented from continuing to do her job with respect to Dr. Vogeler after
making this report, and that she subsequently attempted to raise this issue outside her normal
chain of command.  Like the plaintiff in *Schweitzer*, Ms. Gatti was instructed by her supervisor
to stop working on Dr. Vogeler's claims after she reported her concerns.  Thereafter, she
forwarded her initial report to the human resources director and attempted to file complaints with
both human resources and the COO about being prevented from doing her job with respect to Dr.
Vogeler.  These complaints to human resources and the COO cannot be considered part of Ms.

17

Gatti's normal job duties but, instead, constitute evidence of ongoing attempts to report her concerns outside her direct chain of command.  Finally, and perhaps most significantly, Ms. Gatti expressly mentioned filing a *qui tam* action to her supervisor on numerous occasions, which her supervisor discussed with Granger's CEO.  These statements were sufficient to put Granger on notice of the possibility of a *qui tam* claim related to Dr. Vogeler's billing.  Viewed in the light most favorable to Ms. Gatti, this evidence is sufficient for a reasonable factfinder to conclude Ms. Gatti engaged in protected activity under the FCA before February 2, 2018, and that Granger was on notice of such activity.

However, Granger is correct that Ms. Gatti's mention of a *qui tam* attorney to the CEO in March 2018 was not protected activity.  Ms. Gatti made this statement after she was informed of Granger's reorganization plans and instructed to report to a different supervisor.  Ms. Gatti refused to comply with this instruction, asserting "[t]he timing of this . . . is not lost on the *qui tam* attorney."  (Ex. G to Granger MSJ, Email from Rebekah Gatti to David Tanner (Mar. 24, 2018), Doc. No. 60-8 at 10.)  However, when the CEO invited her to disclose any ongoing, unresolved issues which could provide the basis for a *qui tam* action, Ms. Gatti refused to provide any further information.  (Ex. G to Granger MSJ, Email from Rebekah Gatti to David Tanner (Mar. 27, 2018, 11:28 a.m.), Doc. No. 60-8 at 8.)  Moreover, she has offered no evidence that Granger's decision to reorganize the coding and revenue cycle departments was connected to the issues she raised regarding Dr. Vogeler's billing practices, or that the order to report to a new supervisor was anything other than a legitimate request.  Under these circumstances, her reference to a *qui tam* attorney in March 2018 cannot reasonably be interpreted as an act "in furtherance of" a *qui tam* action or an effort to stop a violation of the FCA.  *See* 31 U.S.C. § 3730(h)(1).  Instead, it appears to have been an attempt to avoid any adverse consequences

stemming from her refusal to comply with her employer's legitimate instruction to report to a new supervisor.  For these reasons, Ms. Gatti's March 24, 2018 mention of a *qui tam* attorney was not protected activity.

In sum, Ms. Gatti has presented evidence sufficient to support a finding that she engaged in protective activity under the FCA before February 2, 2018, and that Granger was on notice of such activity.  However, Ms. Gatti has not presented evidence of protected activity after February 2, 2018.

2.  Causation

Granger next argues Ms. Gatti cannot show she was terminated "because of" any protected activity.  (Granger MSJ 20, Doc. No. 60.)

"In order to prove that the action was taken 'because of' the protected activity, the employee must show that the retaliation 'was motivated, at least in part, by the employee's engaging in protected activity.'"  *United States ex rel. Howard v. Lockheed Martin Corp.*, 14 F. Supp. 3d 982, 1021 (S.D. Ohio 2014) (quoting *McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 514 n.4 (6th Cir. 2000)).  "[T]he Tenth Circuit recognizes the use of circumstantial evidence that 'justif[ies] an inference of retaliatory motive, such as protected conduct closely followed by adverse action.'"  *Miller v. Inst. for Def. Analyses*, No. 17-cv-02411-NYW, 2019 U.S. Dist. LEXIS 30332, at *22 (D. Colo. Feb. 26, 2019) (unpublished) (quoting *Burrus v. United Tel. Co. of Kansas*, 683 F.2d 339, 343 (10th Cir. 1982)); *see also United States v. Dental Dreams, LLC*, 307 F. Supp. 3d 1224, 1247 (D.N.M. 2018) ("Temporal proximity between protected activity and the adverse action may permit an inference of causation.").  However, the Tenth Circuit has indicated temporal proximity alone is insufficient unless the protected activity

and adverse action occur "within days, or at most, weeks of each other." *Hennagir v. Utah Dep't of Corr.*, 587 F.3d 1255, 1266 (10th Cir. 2009) (citation omitted).

Ms. Gatti asserts she was terminated because of her complaints regarding Dr. Vogeler and her express threats to file a *qui tam* lawsuit.[5] (Opp'n to Granger MSJ 26–27, Doc. No. 75.) She has presented no direct evidence this was the reason for her termination but, instead, relies on temporal proximity, arguing the CEO decided to eliminate her position "shortly upon learning" of her intent to file a *qui tam* lawsuit. (*Id.* at 28.) However, as set forth above, the protected activity occurred before February of 2018, and Granger's CEO became aware of her threats to file a *qui tam* claim on February 2, 2018. Ms. Gatti was not terminated until more than two months later, on April 18, 2019. The temporal proximity between these two events is insufficient, on its own, to permit an inference of causation. *See Hennagir*, 587 F.3d at 1266.

Ms. Gatti has failed to present any other evidence connecting the protected activity with her termination. Ms. Gatti was terminated only after she refused to comply with Granger's reorganization plans on March 23, 2018. Before this, she had not faced any adverse employment action. After she openly and directly refused to comply, the CEO decided to eliminate her position, and her termination letter indicated her position was eliminated due to the reorganization. Ms. Gatti has failed to offer evidence that her protected activity prior to February 2018 was a motivating factor in this decision.

---

[5] Ms. Gatti's claim is based solely on her termination; she does not claim being ordered to report to a different supervisor, or any other action by Granger, constituted an adverse employment action.

Because she has not presented evidence sufficient to establish a causal link between the protected activity and her termination, Ms. Gatti cannot establish a prima facie case of retaliation under the FCA.

### 3. Pretext

Even if Ms. Gatti had presented sufficient evidence to prove a prima facie case of retaliation, she has not presented evidence that Granger's proffered legitimate, nonretaliatory reason for terminating her was pretextual.

"Pretext exists when an employer does not honestly represent its reasons for terminating an employee." *Miller v. Eby Realty Group LLC*, 396 F.3d 1105, 1111 (10th Cir. 2005).

> A plaintiff can meet this burden to show pretext in either of two ways: (1) by showing that the proffered reason is factually false or (2) by showing that discrimination was a primary factor in the employer's decision, which is often accomplished by revealing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered reason[], such that a reasonable fact finder could deem the employer's reason unworthy of credence.

*Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1218 (10th Cir. 2013) (alteration in original; internal quotation marks omitted) (discussing Title VII employment discrimination claim); *see also United States ex rel. Sharp v. E. Okla. Orthopedic Ctr.*, No. 05-CV-572-TCK-TLW, 2013 U.S. Dist. LEXIS 154646, at *44–45 (N.D. Okla. Oct. 29, 2013) (unpublished) (applying this standard to FCA retaliation claim). A plaintiff who offers evidence showing the employer's proffered reason for termination is pretextual creates a triable question of fact as to retaliatory intent. *See Sharp*, 2013 U.S. Dist. LEXIS 154646, at *44.

Ms. Gatti argues Granger's proffered reason—elimination of her position due to a reorganization—was pretextual because the reorganization plan did not originally include eliminating her position. (Opp'n to Granger MSJ 28–32, Doc. No. 75.) Specifically, she points to the fact that the third-party auditor's report did not recommend elimination of the coding

manager position, as well as the CEO's testimony that he decided to eliminate her position only a day or two before her termination.  (*See* Curas Report, Doc. No. 75-1 at 70–114; Tanner Dep. 174:20–175:3, Doc. No. 75-1 at 140.)  However, as set forth above, Ms. Gatti refused to comply with the original reorganization plan which called for her to report to a new supervisor.  It was only after this refusal that the CEO decided to eliminate her position as part of the reorganization.  The CEO explained in his deposition that, while the reorganization was reason Ms. Gatti was terminated, her insubordination was a "contributing factor" because, absent her refusal to comply, she would have remained at Granger and merely reported to a new supervisor. (Tanner. Dep. 125:5–126:6, Doc. No. 75-1 at 131–32.)

In light of Ms. Gatti's refusal to comply with the original reorganization plan, the fact that the original plan did not include elimination of her position is not evidence of "weaknesses, implausibilities, inconsistencies, incoherencies, and contradictions" in Granger's proffered reason.  *See Tabor*, 703 F.3d at 1218.  Rather, Granger's unrefuted evidence shows any inconsistency between the original reorganization plan and the ultimate decision to eliminate Ms. Gatti's position was due to her refusal to comply with the original plan's requirements.  Because the change in the reorganization plan is adequately explained by Ms. Gatti's refusal to comply, it does not undermine Granger's stated reason for terminating Ms. Gatti.  Thus, Ms. Gatti has failed to offer evidence showing Granger's proffered reason for terminating her was false or unworthy of credence.

### D.  Conclusion

For these reasons, the court GRANTS Granger's motion for summary judgment (Doc. No. 60) and enters judgment in favor of Granger on Ms. Gatti's claim of retaliation under the False Claims Act, which is her sole claim in this action.

## II.    MS. GATTI'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 57)

Ms. Gatti moves for summary judgment on Granger's counterclaims of breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, violation of Utah's Uniform Trade Secrets Act, and injunctive relief.  (Gatti MSJ 1, Doc. No. 60.)  Each of these claims is based on allegations that Ms. Gatti improperly retained confidential documents belonging to Granger after her termination and obtained secret recordings of three company meetings from another former employee.  (Am. Answer and Countercl. ¶¶ 28, 37, 46, 52, 63, Doc. No. 49.)

### A.  Relevant Facts

As part of her employment with Granger, Ms. Gatti entered into various agreements prohibiting her from disclosing confidential information or accessing such information without a specific need, and prohibiting use of her personal email address to conduct business.  (Def.'s Mem. in Opp'n to Pl.'s Mot. for Summ. J. ("Opp'n to Gatti MSJ"), Statement of Additional Material Facts ("Add'l Facts") ¶¶ 2–7, Doc. No. 76.)[6]  During her employment, Ms. Gatti printed and saved documents containing confidential information and sent confidential information to her personal email account, which she retained after her termination in April 2018.  (*Id.* ¶¶ 9–10, Doc. No. 76 at 9.)[7]  According to Ms. Gatti, she "retained fewer than 150 pages of Granger

---

[6] Ms. Gatti's reply does not dispute the portions of Granger's Statement of Additional Material Facts cited in this order.  (*See* Counter-Def.'s Reply Br. in Support of Mot. for Summ. J. on Countercls. 3–4, Doc. No. 85 (disputing only certain assertions regarding David Tanner's deposition testimony and whether a *qui tam* action had been filed).)

[7] Granger's Statement of Additional Facts contains two paragraphs numbered "10" and two paragraphs numbered "11."  (Opp'n to Gatti MSJ, Add'l Facts, Doc. No. 76 at 9–10.)  Where these paragraphs are cited in this order, the page number of the opposition brief is also cited in order to distinguish between paragraphs with duplicative numbering.

documents because [she] believed the documents provided support for [her] claim that [she] had been retaliated against for reporting Dr. Vogeler's fraudulent conduct," and she "did so solely for the purpose of reporting or investigating a suspected violation of law." (App. to Gatti MSJ, Decl. of Rebekah Gatti ("Gatti Decl.") ¶ 5, Doc. No. 57-1 at 4.)

After her termination, Ms. Granger obtained three recordings of Granger's private executive meetings from another former employee, Amanda Babbitt, which Ms. Babbitt had secretly recorded. (Opp'n to Gatti MSJ, Add'l Facts ¶ 11, Doc. No. 76 at 9–10.) Ms. Gatti was aware Ms. Babbitt had secretly recorded the meetings when she received the recordings from her. (*Id.*)

Ms. Gatti later produced the documents she had retained, as well as the recordings she had obtained from Ms. Babbitt, to Granger in this litigation. (*Id.* ¶ 10, Doc. No. 76 at 10.) According to Granger, these documents contained confidential and proprietary information including: confidential internal emails regarding business plans, internal procedures, patients, and billing information; handwritten notes regarding Granger's internal operations and confidential information; Dr. Vogeler's internal and confidential information regarding procedures, patients, and billing information; Granger's coding criteria, data, and collection information; internal memoranda to Granger's Board of Directors containing confidential information and business plans; confidential information relating to Granger's patients; transcripts of secretly recorded meetings containing confidential and proprietary information, including business plans; documents from Granger's internal files; and recordings of such private meetings maintained on Google Drive. (*Id.* ¶ 11, Doc. No. 76 at 10; Ex. E to Opp'n to Gatti MSJ, Decl. of Mary Jane Pennington in Support of Granger Medical Clinic's Mem. in Opp'n to Rebekah Gatti's Mot. for Summ. J. ("Pennington Decl.") ¶¶ 6–16, Doc. No. 76-6.) Granger

considers this information to be confidential, proprietary, and a trade secret.  (Pennington Decl. ¶ 16, Doc. No. 76-6.)

After Ms. Gatti produced the recordings she obtained from Ms. Babbitt, Granger filed an action against Ms. Babbitt in Utah state court: *Granger Medical Clinic v. Babbitt*, Case No. 190904738 (Third Judicial District Court, Salt Lake County, Utah).  (Opp'n to Gatti MSJ, Add'l Facts ¶ 12, Doc. No. 76.)  Granger obtained a default judgment against Ms. Babbitt in that case, which included monetary damages of $91,846.42, permanent injunctive relief, and a finding that Ms. Babbitt had "misappropriated Granger's Confidential Information and Trade Secrets" as those terms were defined in the judgment.  (Ex. C to Opp'n to Gatti MSJ, Default J. and Permanent Inj., Doc. No. 76-4.)

Granger amended its answer to include counterclaims against Ms. Gatti on October 16, 2019.  (Am. Answer and Countercl., Doc. No. 49.)  Granger then provided supplemental disclosures, identifying its damages for its first four counterclaims as follows:

> (a) all costs and attorney's fees associated with this case since Gatti made it clear she had and intended to disclose and use Granger's confidential information and trade secrets (estimated at this point to be over $80,000, but which amount continues to grow as this case persists); (b) all costs and attorney fees incurred by Granger in order to retrieve Granger's confidential information and trade secrets misappropriated by Gatti and disseminated to third parties by Gatti (the extent of which misappropriation  and dissemination is not yet known); (c) all time and expense of investigations made necessary as a result of Gatti's misappropriation and dissemination of Granger's confidential information and trade secrets, the extent of which is not yet known, including lost time and resources of Granger executives that have been incurred as a direct result of Gatti's various breaches and tortious acts (estimated at this point to be approximately $30,000, but which amount continues to grow); (d) all reputational damages to Granger as a result of Gatti's actions, which damages are not yet calculated but are approximated at $50,000; and (e) punitive damages, the request for which is likely to be one to two times Granger's total monetary damages.

(App. to Gatti MSJ, Granger's Suppl. Initial Disclosures, Doc. No. 57-1 at 21–22.)  In a declaration supporting Granger's opposition to Ms. Gatti's motion for summary judgment,

Granger's President and CEO states that "[t]he figures provided pursuant to these disclosures accurately represent, to the best of Granger's abilities, the damages Granger has incurred as a direct result of Gatti's misappropriation."  (Pennington Decl. ¶ 22, Doc. No. 76-6.)

In her declaration, Ms. Gatti states she has not used the documents she retained from Granger and obtained from Ms. Babbitt for any purpose other than pursuing her claims against Granger.  (Gatti Decl. ¶ 6, Doc. No. 57-1 at 5.)   She also states she would have filed this action regardless of whether she retained any Granger documents or obtained the recordings from Ms. Babbitt.  (*Id.*)

### B.  Analysis

Ms. Gatti argues she entitled to summary judgment on Granger's counterclaims because (1) Granger cannot establish causation or damages for any of its claims; (2) any claim based on use of company information in this case is barred by judicial privilege; (3) Granger cannot show the documents at issue contain trade secrets; (4) as a victim of retaliation, Ms. Gatti is immune from Granger's claims under the Defend Trade Secrets Act, 18 U.S.C. § 1833; and (5) Granger is not entitled to injunctive relief because Ms. Gatti has not threatened to use company information for any purpose other than litigation against Granger.  (Gatti MSJ 5–17, Doc. No. 57.)

#### 1.  Causation and Damages

Causation and damages are required elements of Granger's common law counterclaims of breach of contract, breach of the implied covenant of good faith and fair dealing, and breach of fiduciary duty.  *See Gould v. Mountain States Tel. & Tel. Co.*, 309 P.2d 802, 805 (Utah 1957) (breach of contract); *Cook Assocs., Inc. v. Utah School & Inst'l Trust Lands Admin.*, 2010 UT App 284, ¶ 37, 243 P.3d 888, 901 (breach of implied covenant of good faith and fair dealing);

*Triesault v. Greater Salt Lake Bus. Dist.*, 2005 UT App 489, ¶¶ 14–16, 126 P.3d 781, 785 (breach of fiduciary duty).

Utah's Uniform Trade Secrets Act, Utah Code Ann. § 13-24-1, *et seq.* (the "UTSA"), allows recovery of both injunctive relief and damages.  *Id.* §§ 13-24-3 (injunctive relief), 13-24-4 (damages).  A party seeking damages under the UTSA must demonstrate the damages were caused by the misappropriation.  *Id.* § 13-24-4(1); *Lifevantage Corp. v. Domingo*, No. 2:13-cv-1037-JNP-PMW, 2016 U.S. Dist. LEXIS 189313, at *55 (D. Utah Sept. 22, 2016) (unpublished).

As an initial matter, Granger argues that under Utah law causation and damages are factual issues which generally cannot be resolved as a matter of law.  (Opp'n to Gatti MSJ 14, Doc. No. 76.)  Although the cases cited by Granger support this general proposition where a factual dispute exists,[8] Utah courts also recognize summary judgment is appropriate where a party fails to create a triable issue of fact as to causation or damages.  *See, e.g.*, *Borghetti v. Sys. & Computer Tech, Inc.*, 2008 UT 77, ¶ 31, 199 P.3d 907, 916; *Triesault*, 2005 UT App 489, ¶ 14, 126 P.3d at 785.  The Utah Supreme Court has held that in order to overcome summary judgment, a party claiming damages must "come forward with admissible evidence that rises above speculation and provides a reasonable, even though not necessarily precise, estimate of damages."  *Borghetti*, 2008 UT 77, ¶ 31, 199 P.3d at 916 (internal quotation marks omitted).  Further, "Utah courts have held that summary judgment on the issue of causation is appropriate, notwithstanding the general rule that causation is a jury issue, when the plaintiff cannot show that a jury could conclude, without speculation, that the injury would not have occurred but for

---

[8] Granger cites the following cases: *Lopez v. United Auto. Ins. Co.*, 2012 UT 10, ¶ 28, 274 P.3d 897, 905; *Long v. Stutesman*, 2011 UT App 438, ¶ 11, 269 P.3d 178, 181; *Sohm v. Dixie Eye Ctr.*, 2007 UT App 235, ¶ 22, 166 P.3d 614, 620; and *Kilpatrick v. Wiley, Rein & Fielding*, 909 P.2d 1283, 1292 (Utah Ct. App. 1996).

the defendant's breach." *Triesault*, 2005 UT App 489, ¶ 14, 126 P.3d at 785 (internal quotation marks omitted); *see also Mahmood v. Ross*, 990 P. 2d 933, 938 (Utah 1999) ("[W]here the proximate cause of the injury is left to conjecture, the plaintiff must fail as a matter of law." (internal quotation marks omitted)).

Granger also argues Ms. Gatti's motion should be denied because she "presents no evidence that Granger has not incurred [] damages as a result of her misappropriation."  (Opp'n to Gatti MSJ 17, Doc. No. 76.)  However, this argument misconstrues the parties' respective burdens on summary judgment.  As the party with the burden of proof at trial as to its counterclaims, Granger—not Ms. Gatti—must present evidence on summary judgment sufficient to create a triable issue of fact as to causation and damages.  *See McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998).

Granger's claimed damages are set forth in its supplemental initial disclosures attached to Ms. Gatti's motion, consisting of: (1) costs and attorney fees associated with this case; (2) "costs and attorney fees incurred by Granger in order to retrieve Granger's confidential information and trade secrets"; (3) time and expense of investigations, including lost time and resources of Granger executives; (4) reputational damages; and (5) punitive damages.  (App. to Gatti MSJ, Granger's Suppl. Initial Disclosures, Doc. No. 57-1 at 21–22.)  Granger submitted a declaration from its President and CEO, Mary Jane Pennington, stating "[t]he figures provided pursuant to these disclosures accurately represent, to the best of Granger's abilities, the damages Granger has incurred as a direct result of Gatti's misappropriation."  (Pennington Decl. ¶ 22, Doc. No. 76-6.)

The disclosure document and Ms. Pennington's declaration are insufficient to establish that Granger incurred the damages claimed or that such damages were caused by Ms. Gatti's

misappropriation of confidential information.  The disclosure document is merely a description of the damages Granger is claiming; it does not, itself, constitute evidence that Granger actually incurred those damages.  And the conclusory statement in Ms. Pennington's declaration fails to provide any explanation of the basis for the amounts claimed or the reasons why such damages are attributable to Ms. Gatti.  As to costs and attorney fees incurred to "retrieve" confidential information, Granger failed to provide evidence showing what actions were taken in this regard, and no reasonable estimate of the amount was disclosed.  As to time and expense of investigations, Granger failed to provide evidence concerning what investigations were undertaken, who was involved, how much time was expended, or what "resources" were lost. As to reputational damages, Granger provided no evidence whatsoever that its reputation was harmed.  Granger does not, for example, provide evidence Ms. Gatti shared the confidential information with competitors, the general public, or anyone else outside of her litigation against Granger.  In other words, Granger failed to present evidence it has suffered any actual damages as a result of Ms. Gatti's retention of confidential information.

As to costs and attorney fees associated with this case, Granger failed to present evidence that its costs and fees incurred in defending the retaliation claim constitute "damages" caused by Ms. Gatti's retention of documents.[9]  Ms. Gatti submitted a declaration stating she would have filed this action regardless of whether she retained any Granger documents or obtained the recordings from Ms. Babbitt.  (Gatti Decl. ¶ 6, Doc. No. 57-1 at 5.)  Granger has not presented

---

[9] This order does not address whether Granger may be awarded costs and attorney fees if it is deemed the prevailing party.

any evidence that the retaliation claim could not have been pursued without these documents.[10]

*See Smitty's Supply, Inc. v. Hegna*, No. 16-13396, 17-4711, 2019 U.S. Dist. LEXIS 36689, at *8 (E.D. La. Mar. 7, 2019) (unpublished) (entering summary judgment against employer on its breach of contract claim based on former employee's retention of documents, where the employer's only claimed damages were the costs of defending the former employee's claims and the employer failed to present evidence that the litigation would not or could not have been pursued without the documents).  To the extent Granger asserts its costs and attorney fees incurred in prosecuting the counterclaims constitute "damages," Granger has cited no authority allowing the damages element of those claims to be met solely based on costs and attorney fees, where there is no evidence of any other injury.

---

[10] While the Tenth Circuit has not addressed this issue, numerous courts in other circuits have concluded public policy bars recovery of damages related to a whistleblower's disclosure of confidential documents to her attorney or to the government in an FCA action, so long as the documents are related to the FCA claims.  *See, e.g.*, *United States ex rel. Cieszynski v. LifeWatch Servs.*, No. 13 CV 4052, 2016 U.S. Dist. LEXIS 68867, at *10–12 (N.D. Ill. May 13, 2016) (unpublished) (dismissing counterclaim for retention of confidential information where related took the documents to support his FCA claim and only shared the documents with his attorneys and the government); *United States ex rel. Ruscher v. Omnicare, Inc.*, No. 4:08-cv-3396, 2015 U.S. Dist. LEXIS 91769, at *14 (S.D. Tex. July 15, 2015) (unpublished) (concluding "public policy will bar Omnicare from recovering from Relator for damages flowing solely from her disclosure of relevant documents to her attorneys and to the government," where the defendant in an FCA action asserted counterclaims for breach of fiduciary duty and misappropriation of trade secrets); *U.S. ex rel. Head v. Kane Co.*, 668 F. Supp. 2d 146, 152 (D.D.C. 2009) (dismissing counterclaim for breach of document-return provisions of separation agreement as contrary to public policy because "[e]nforcing a private agreement that requires a qui tam plaintiff to turn over his or her copy of a document, which is likely to be needed as evidence at trial, to a defendant who is under investigation would unduly frustrate the purpose of" the FCA); *cf. United States ex rel. Wildhirt v. AARS Forever, Inc.*, 2013 U.S. Dist. LEXIS 133982, at *8, 15–17 (N.D. Ill. Sept. 19, 2013) (unpublished) (allowing counterclaims to proceed where relators brought home confidential documents "haphazardly and for no particular purpose," with no intention at the time of filing a *qui tam* suit, and the documents "went beyond the scope of those necessary to pursue their *qui tam* suit").  Because Granger fails to present adequate evidence it suffered damages caused by the alleged misappropriation in this case, the court need not address whether these public policy considerations would also bar Granger's damages claims.

Under Utah law, "punitive damages may be awarded only if compensatory or general damages are awarded."  Utah Code Ann. § 78B-8-201(1)(a).  Because Granger fails to present evidence that it has suffered compensatory or general damages, its claim for punitive damages must also fail.

For the first time in its opposition brief, Granger also argues it is entitled to "costs and attorney's fees incurred to obtain relief against [Ms. Gatti's] cohort, Ms. Babbitt, in order to learn the extent of their joint misappropriation."  (Opp'n to Gatti MSJ 17, Doc. No. 76.)  These damages were not disclosed in the computation of damages in Granger's supplemental initial disclosures.  (*See* App. to Gatti MSJ, Granger's Suppl. Initial Disclosures, Doc. No. 57-1 at 21–22.)  And Granger is not entitled to overcome summary judgment based on damages it failed to disclose.  *See* Fed. R. Civ. P. 37(c)(1); *see also Lifevantage Corp.*, 2016 U.S. Dist. LEXIS 189313, at *56–57 ("A party may not avoid summary judgment by articulating, for the first time, a completely novel theory of damages.").  Further, the only supporting evidence Granger provides is a default judgment entered against Ms. Babbitt in the state-court case.  (Ex. C to Opp'n to Gatti MSJ, Default J. and Permanent Inj., Doc. No. 76-4.)  Notably, Ms. Gatti was not a party to that case, and Granger provides no authority supporting its position that Ms. Gatti is liable for a judgment entered against another individual in a separate case to which she was not a party.  Nor has Granger presented any evidence in this case supporting the amount of the judgment or showing the amount was attributable to Ms. Granger's conduct.  Accordingly, the state-court judgment against Ms. Babbitt does not create a triable issue of fact as to damages in this case.

Because Granger failed to present evidence to support its claimed damages, Ms. Gatti is entitled to summary judgment on Granger's counterclaims for breach of contract, breach of the

implied covenant of good faith and fair dealing, and breach of fiduciary duty.  Additionally, Ms. Gatti is entitled to summary judgment as to Granger's claim for damages related to misappropriation of trade secrets under the UTSA.

### 2.  Injunctive Relief

The only remaining counterclaim is Granger's claim for injunctive relief under the UTSA.  Granger seeks "injunctive relief to prevent further dissemination and disclosure" of trade secrets, and an "order requiring and compelling Gatti to return all confidential information and trade secrets, and compelling Gatti to undertake other affirmative acts to protect Granger's trade secrets and to prevent further dissemination."  (Am. Answer and Countercl. ¶¶ 54, 63, Doc. No. 49.)

Under the UTSA, "a prima facie case of misappropriation is established on the basis of two essential elements: existence of a protectable 'trade secret' of a plaintiff and demonstration of 'misappropriation' by a defendant."  *InnoSys, Inc. v. Mercer*, 2015 UT 80, ¶ 24, 364 P.3d 1013, 1018 (quoting Utah Code Ann. § 13-24-2.  The UTSA provides that "[a]ctual or threatened misappropriation may be enjoined."  Utah Code Ann. § 13-24-3(1).  Further, "[i]n appropriate circumstances, affirmative acts to protect a trade secret may be compelled by court order."  *Id.* § 13-24-3(3).

Ms. Gatti argues she is entitled to summary judgment on this claim because (1) Granger has failed to show the documents at issue contain trade secrets; (2) any claim based on use of company information in this case is barred by the judicial proceeding privilege; (3) she is immune from Granger's claims under the Defend Trade Secrets Act, 18 U.S.C. § 1833; and (4) Granger is not entitled to injunctive relief because she has not threatened to use company

information for any purpose other than litigation against Granger.  (Gatti MSJ 11–17, Doc. No. 57.)

    *a.  Existence of Trade Secrets*

The UTSA defines "trade secret" as:

> information, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> > (a) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
> >
> > (b) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Utah Code Ann. § 13-24-2(4).  "What constitutes a trade secret is a question of fact."  *CDC Restoration & Constr., LC v. Tradesmen Contractors, LLC*, 2012 UT App 60, ¶ 13, 274 P.3d 317, 323 (citation omitted).  "The burden of demonstrating the existence of a trade secret is on the [claimant], and there is no presumption in his or her favor."  *Id.* (citation omitted).

Granger asserts the documents containing its trade secrets are as follows:

> internal correspondence regarding Granger's coding and billing that is not generally known; internal complaints to HR about individuals not a party to this litigation; notes taken by Ms. Babbitt while secretly recording private and confidential conversations in Granger's medical offices; Granger's internal production reports which are private and not made known outside of Granger; outside audits of Granger medical and billing charts; internal emails from Granger's CEO about Granger's proposed reorganization; internal computations and communications regarding Dr. Vogeler's claims and billing practices; and internal reports from Granger's Medical Coding Review committee.

(Opp'n to Gatti MSJ 24, Doc. No. 76.)  As supporting evidence, Granger provides the declaration of its President and CEO, Ms. Pennington.  Ms. Pennington describes the same list of documents and, for each category, states Granger considers the information therein to be private, confidential, and a trade secret.  (Pennington Decl. ¶¶ 6–15, Doc. No. 76-6.)  She asserts this

information relates to Granger's productivity, competitiveness, and profitability, and "would not be shared with others." (*Id.* ¶¶ 8–15.)  Additionally, she explains, "Granger takes great care to try and ensure that its private and confidential information remains private and confidential" by requiring employees to sign a confidentiality agreement, requiring employees to follow the terms of the employee handbook, and ardently enforcing those documents.  (*Id.* ¶ 17.)

Ms. Pennington's declaration provides just enough information to raise a triable issue of fact as to whether the documents at issue contain trade secrets.  She describes specific actions taken by Granger to maintain the secrecy of the information in the documents.  And although she does not explain in detail how Granger derives economic value from the information not being generally known, a factfinder could fairly infer Granger derives value from keeping its billing and coding practices and other aspects of its business operations confidential from competitors.  Accordingly, Granger has presented sufficient evidence to raise a triable issue of fact as to whether at least some of the documents at issue contain trade secrets under the UTSA.

### b.  *Judicial Proceeding Privilege*

Utah's judicial proceeding privilege "protects participants in the judicial process from liability for statements made during an official proceeding."  *Peterson v. XPO Logistics, Inc.*, 812 F. App'x 754, 756 (10th Cir. 2020) (unpublished) (citing *Krouse v. Bower*, 2001 UT 28, 20 P.3d 895, 898).  The privilege applies to statements which (1) are "made during or in the course of a judicial proceeding"; (2) "have some reference to the subject matter of the proceeding"; and (3) are "made by someone acting in the capacity of judge, juror, witness, litigant, or counsel." *DeBry v. Godbe*, 1999 UT 111, ¶ 11, 992 P.2d 979, 983 (citation omitted).  This privilege is "intended to promote the integrity of the adjudicatory proceeding and its truth finding processes."  *Id.* ¶ 10, 992 P.2d at 983.

34

Granger argues this privilege applies only to claims based on defamatory statements and does not apply to a misappropriation of trade secrets claim.  (Opp'n to Gatti MSJ 22, Doc. No. 76.)  Ms. Gatti argues the privilege applies broadly to all types of claims, including Granger's claims related to use of an alleged trade secret in a legal proceeding.  (Gatti MSJ 12, Doc. No. 57.)

"Historically, the judicial proceeding privilege in Utah has been used to immunize[] certain statements that are made during a judicial proceeding from defamation claims." *Moss v. Parr Waddoups Brown Gee & Loveless*, 2012 UT 42, ¶ 28, 285 P.3d 1157, 1165 (internal quotation marks omitted, alteration in original).  However, the Utah Supreme Court has "extended the privilege beyond defamation claims to include all claims arising from the same statements." *Id.* (internal quotation marks omitted).  Additionally, "[t]he privilege protects not only judicial participants' statements, but also their conduct." *Peterson*, 812 F. App'x at 757 (citing *Moss*, 2012 UT 42, ¶ 45, 285 P.3d at 1168).  In *Moss*, the Utah Supreme Court found claims against a law firm for breach of a settlement agreement, abuse of process, and invasion of privacy were precluded by the judicial proceeding privilege.  2012 UT 42, ¶¶ 39–43, 285 P.3d at 1167–68.  The court explained that the privilege was not without limits, however, and could be lost "[w]here a plaintiff pleads that an attorney has engaged in independent acts, that is to say acts outside the scope of his representation of his client's interests, or has acted solely for his own interests and not his client's." *Id.* at ¶ 37, 285 P.3d at 1166.

In *Sorensen v. Polukoff*, a court in this district considered an employee's argument that his former employer's misappropriation of trade secrets claim was barred by Utah's judicial proceeding privilege, where the employee used the allegedly misappropriated information in a *qui tam* action against the employer.  No. 2:18-cv-67, 2020 U.S. Dist. LEXIS 61795, at *7–9 (D.

Utah Apr. 7, 2020) (unpublished) (considering a Rule 12(b)(6) motion to dismiss).  The employer, a doctor, alleged the employee fraudulently obtained a hard drive containing records of 10,000 patients, and later used the information in his *qui tam* action and to solicit the employer's former patients to participate in medical malpractice suits against the employer.  *Id.* at *3–5.  The court found "Plaintiff has alleged conduct that is unrelated to judicial proceedings and, thus, would not be protected by the privilege."  *Id.* at *8.  The court also noted the employer had alleged fraud and bad faith.  *Id.*  The court concluded dismissal was not appropriate because "[t]here may be portions of Plaintiff's claims that are barred by this privilege, but it would not dispose of them entirely."  *Id.* at *8–9.

Granger's argument that the judicial proceeding privilege is categorically inapplicable to misappropriation claims is not persuasive.  As set forth above, Utah courts have extended the privilege to "all claims" based on statements made in the course of judicial proceedings, as well as conduct.  *See Moss* 2012 UT 42, ¶ 28, ¶ 35, 285 P.3d at 1165–66.  Thus, the judicial proceeding privilege applies to Granger's misappropriation claim insofar as it is based on Ms. Gatti's use of confidential information and trade secrets relevant to her retaliation claim during this litigation, or in a *qui tam* action.  To the extent Granger seeks to enjoin Ms. Gatti's use of such information in these judicial proceedings, this portion of the claim is barred by the judicial proceeding privilege.

However, Granger's misappropriation claim is also based, at least in part, on conduct occurring before judicial proceedings commenced.  Granger asserts Ms. Gatti improperly accessed and saved confidential documents during her employment and retained those

documents after she was terminated.[11]  (Opp'n to Gatti MSJ, Add'l Facts ¶¶ 9–10, Doc. No. 76 at 9.)  Granger also seeks to enjoin "further dissemination and disclosure" of that information, including prohibiting dissemination or disclosure outside of litigation.  (Am. Answer and Countercl. ¶¶ 54, 63, Doc. No. 49.)  These portions of the Granger's misappropriation claim fall outside the scope of the judicial proceeding privilege.

Therefore, Granger's misappropriation of trade secrets claim under the UTSA is not barred by the judicial proceeding privilege to the extent it is based on conduct unrelated to judicial proceedings and seeks an injunction prohibiting dissemination and disclosure of its trade secrets outside of judicial proceedings.

### c.  Immunity Under the Defend Trade Secrets Act

The Defend Trade Secrets Act ("DTSA") provides immunity to individuals from liability under any federal or state trade secret law in certain circumstances, including: (1) disclosure to the government for the purpose of reporting or investigating a suspected violation of the law; (2) disclosure in court documents filed under seal; and (3) disclosure to an attorney and use of trade secret information in a lawsuit for retaliation by an employer for reporting a suspected violation of law.  18 U.S.C. § 1833(b)(1)–(2).  However, the DTSA does not limit liability for "an act that is otherwise prohibited by law, such as the unlawful access of material by unauthorized means." *Id.* § 1833(b)(5).

Granger argues Ms. Gatti is not entitled to immunity under this act because (1) Granger has not invoked the DTSA, (2) Ms. Gatti failed to plead immunity as an affirmative defense, and

---

[11] Ms. Gatti asserts she took this action in preparation for her retaliation claim, (Gatti MSJ 2, Doc. No. 57), but did not establish this action would fall within the scope of a "judicial proceeding" under Utah law.

(3) the exception regarding unlawful access by unauthorized means applies.  (Opp'n to Gatti

MSJ 25–26, Doc. No. 76.)

As to Granger's first argument, the DTSA contains no requirement the accusing party

must first assert a claim under the DTSA for the immunity provisions to apply.  Indeed, the plain

language of the DTSA explicitly provides immunity from liability under state trade secret laws.

*See* 18 U.S.C. § 1833(b)(1).  Accordingly, the immunity provision of the DTSA is applicable to

Granger's claim under the UTSA, regardless of whether Granger invoked the DTSA.

Granger is correct, however, that Ms. Gatti failed to plead statutory immunity as an

affirmative defense in her answer to Granger's counterclaims.  (*See* Countercl. Def.'s Original

Answer, Doc. No. 50.)  Rule 8 of the Federal Rules of Civil Procedure requires a party to

"affirmatively state any avoidance or affirmative defense" in responding to a pleading.  Fed. R.

Civ. P. 8(c)(1).  "Failure to plead an affirmative defense results in a waiver of that defense."

*Bentley v. Cleveland Cnty Bd. of Cnty Comm'rs*, 41 F.3d 600, 604 (10th Cir. 1994).  And

statutory immunity is an affirmative defense which must be pleaded.  *Id.*; *see also FirstEnergy

Corp. v. Pircio*, No. 1:20-cv-1966, 2021 U.S. Dist. LEXIS 43163, at *19 (N.D. Ohio Mar. 8,

2021) (unpublished) (noting DTSA immunity is an affirmative defense).  Accordingly, Ms. Gatti

has waived any defense of immunity under the DTSA.

### d.   *Absence of Threatened Use*

Finally, Ms. Gatti argues Granger is not entitled to injunctive relief because she has not

threatened to use confidential company information for any purpose other than litigation against

Granger.  (Gatti MSJ 16–17, Doc. No. 57.)

To obtain a permanent injunction, a movant must prove: "(1) actual success on the

merits; (2) irreparable harm unless the injunction is issued; (3) the threatened injury outweighs

the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Husky Ventures, Inc. v. B55 Invs., Ltd.*, 911 F.3d 1000, 1011 (10th Cir. 2018) (citation omitted).

Ms. Gatti argues Ganger cannot prove irreparable harm, relying primarily on *First American Title Insurance Company v. Northwest Title Insurance Agency, LLC*, No. 2:15-cv-00229, 2016 U.S. Dist. LEXIS 133521 (D. Utah Sept. 27, 2016) (unpublished).  In that case, the court denied an employer's request for a preliminary injunction on its claim against former employees for misappropriation of trade secrets under the UTSA where there was "no evidence showing that the use [was] continuing or threatened."  *Id.* at *15.  The court found "an injunction ordering defendants to cease using the appropriated material would be meaningless."  *Id.*  The court also found "enjoining the parties to disgorge any material taken from [the employer] would have little real effect" because "[a]ny value the material had as trade secrets is lost in the now 18 months since the alleged misappropriation."  *Id.*

Ms. Gatti also cites *Standard Brands, Inc. v. Zumpe*, 264 F. Supp. 254 (E.D. La. 1967), in which the court held an employer was not entitled to an injunction prohibiting a former employee from disclosing trade secrets where the employer did not allege the former employee actually intended to divulge the secrets or that disclosure was inevitable.  *Id.* at 268–69.  The court noted an injunction cannot be issued "to restrain one from doing what he is not attempting and does not intend to do."  *Id.* at 268 (citation omitted).

Granger, on the other hand, relies on case law holding irreparable harm is presumed under UTSA where trade secret misappropriation is found.  *See Bimbo Bakeries USA, Inc. v. Sycamore*, No. 2:13-cv-00749, 2018 U.S. Dist. LEXIS 54556, at *12 (D. Utah Mar. 29, 2018) ("Under the UTSA, there is a presumption of irreparable harm where trade secret

misappropriation is found."); *InnoSys, Inc. v. Mercer*, 2015 UT 80, ¶ 34, 364 P.3d 1013, 1020

("A long-settled principle of trade secret law recognizes a presumption of harm upon proof of

misappropriation."); *see also Star Fuel Marts, LLC v. Sam's E., Inc.*, 362 F.3d 639, 651–52 (10th

Cir. 2004) (holding that irreparable harm is presumed where a defendant is engaged in an act for

which injunctive relief is statutorily proscribed).  Under these cases, irreparable harm does not

require a likelihood of additional disclosures.  *See Bimbo Bakeries USA*, 2018 U.S. Dist. LEXIS

54556, at *12–13 ("[A] plaintiff need not prove economic harm or the likelihood of additional

disclosures"); *InnoSys, Inc.*, 2015 UT 80, ¶ 36, 364 P.3d at 1022 (Courts "have not generally

required proof of a likelihood of additional disclosures or of measurable economic harm as a

prerequisite to the issuance of injunctive relief.").  The presumption of irreparable harm is

rebuttable only based on a showing that the trade secret no longer exists.  *See Bimbo Bakeries*

*USA*, 2018 U.S. Dist. LEXIS 54556, at *12; *InnoSys, Inc.*, 2015 UT 80, ¶ 36, 364 P.3d at 1022.

In *InnoSys, Inc.*, a former employee forwarded confidential information to a personal

email address and retained information on a thumb drive, which she then disclosed to her

attorney and the Department of Workforce Services after she was terminated.  2015 UT 80, ¶ 29,

364 P.3d at 1019.  The Utah Supreme Court reversed entry of summary judgment on the

employer's UTSA claim, finding the employee failed to rebut the presumption of irreparable

harm even though she asserted she had deleted the information and she did not threaten any

further disclosure.  *Id.* at ¶¶ 38–39, 46, 364 P.3d at 1022, 1024–25.

The cases cited by Granger establish that, under the Utah Supreme Court's interpretation

of the statute, a party is not required to show ongoing or threatened use of trade secrets to be

entitled to injunctive relief under the UTSA.  Thus, Ms. Gatti is not entitled to summary

judgment based on Granger's failure to present evidence that Ms. Gatti intends to disclose trade

secrets outside of this litigation, because no such showing is required.  Further, unlike in *First American Title Insurance Company*, the parties have not presented evidence on summary judgment that the trade secrets at issue have expired.  Accordingly, Granger is entitled to a presumption of irreparable harm based past misappropriation—an element which Ms. Gatti does not dispute for purposes of her summary judgment motion.

For these reasons, Granger has presented evidence sufficient to preclude summary judgment on its claim for injunctive relief under the UTSA.

<u>CONCLUSION</u>

The court GRANTS Granger's Motion for Summary Judgment (Doc. No. 60) and enters judgment in favor of Granger on Ms. Gatti's claim of retaliation under the False Claims Act, which is her sole claim in this action.  The court GRANTS IN PART AND DENIES IN PART Ms. Gatti's motion for summary judgment on Granger's counterclaims (Doc. No. 57).  The court GRANTS the motion and enters summary judgment in favor of Ms. Gatti on Granger's counterclaims of breach of contract, breach of the implied covenant of good faith and fair dealing, and breach of fiduciary duty, and on its counterclaim for damages under Utah's Uniform Trade Secrets Act.  The court DENIES the motion with respect to Granger's claim for injunctive relief under Utah's Uniform Trade Secrets Act.

DATED this 29th day of March, 2021.

BY THE COURT:

_Daphne A. Oberg_
Daphne A. Oberg
United States Magistrate Judge